**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

| | |
|---|---|
| **CHRIST THE KING PARISH IN RUTLAND,**<br>**ST. AUGUSTINE PARISH IN MONTPELIER,**<br>**ST. MONICA PARISH IN BARRE,**<br>**MATER DEI PARISH IN NEWPORT,**<br>**CHRIST THE KING ST. ANTHONY PARISH IN BURLINGTON,**<br>**ST. JOHN THE BAPTIST PARISH IN NORTH BENNINGTON,**<br>**HOLY CROSS AND OUR LADY OF GRACE PARISH IN COLCHESTER,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**P.A., M.F., D.S., M.R., C.B., C.C.,**<br>**JOHN AND JANE DOE I-X**<br>**Defendants.** | **Civil Action No. 2:26-cv-249** |

## COMPLAINT

NOW COME the plaintiffs, Christ the King Parish in Rutland, St. Augustine Parish in Montpelier, St. Monica Parish in Barre, Mater Dei Parish in Newport, Christ the King St. Anthony Parish in Burlington, St. John the Baptist Parish in North Bennington, Holy Cross and Our Lady of Grace Parish in Colchester (collectively Parishes), by and through their attorneys, Kaveh S. Shahi, Gfeller Laurie LLP, and allege as follows:

## NATURE OF ACTION

1. This is a declaratory judgment action pursuant to 28 U.S.C. §§2201-2202 to determine the constitutionality of the civil litigation pending against the Parishes by the defendants who claim to be the victims of clergy sexual abuse in the 1970's. The defendants are also claimants in a pending bankruptcy proceeding under Chapter 11 filed by the Diocese of Burlington, Vermont (the "Diocese"). The Parishes are Roman Catholic parishes in Vermont (collectively the

"parishes"). Under civil law, the parishes are unincorporated associations, and under Canon Law they are communities of individuals who are baptized as Catholics and reside in the geographical area of a parish. The parishes do not consent to the bankruptcy court deciding the constitutional issues raised in this case. *Cf. Wellness International Network, Ltd. v. Sharif,* 575 U.S. 665, 135 S.Ct.1932 (2015).

2. The parishes have not committed any wrongs. The alleged offending priests and those who negligently allowed the abuse to take place should have to individually answer the allegations against them. But the imposition of their liability on the parishes is unconstitutional. The defendants and other claimants in the bankruptcy case (collectively the "Claimants") seek to use the civil courts, state courts and federal bankruptcy court, to take away the properties equitably owned by the parishes, impose crushing damages on the parishes and, as will be explained below, to hold individual parishioners responsible for damages because of their mere association as the faithful and the exercise of their First Amendment Right to freely exercise religion. The civil actions violate the Church Autonomy doctrine under the First Amendment by changing the nature of the parishes and membership under Canon Law.

3. The parishes had no authority over the pastors and priests who were assigned by the Dioceses to the parishes. The assignment of priests to parishes was the Canonical responsibility of the Diocese to provide pastoral care for the parishioners. The Diocese and specifically the Bishop has the authority to retain, supervise, transfer and/or discipline priests. The exercise of that authority has exposed the Diocese to civil claims over the years for clergy abuse under common law negligence for the failure to properly supervise, assign, transfer and/or discipline priests to keep minor parishioners safe.

4. The decisions made by Diocesan leaders some 50 years ago relative to the control of priests were the product of complex factors at the time that lacked full understanding of pedophilia, the challenges with the treatment and/or management of it, and the impact of abuse on children. This lack of understanding was echoed throughout society including institutions such as schools, law enforcement, social services, mental health services and even some parents of the children at risk. The parishioners were not involved in the decisions made by Diocesan leaders and were largely unaware of the clergy abuse problem.

5. A global settlement of all known clergy abuse claims was reached by the Diocese in 2013. Subsequently additional claims were brought against the Diocese which filed for bankruptcy protection in 2024, an action currently pending. To date the bankruptcy has only depleted Diocesan assets by over $2 million paid to the attorneys and consultants for the Claimants and the Diocese. All of the money has gone to attorneys and consultants; none has gone to the relief of victims. The money that should have compensated the victims has not provided any relief. The lawyers for some of the abuse claimants sued the Parishes in state courts in late 2025 and early 2026 while the Diocese was running out of liquid assets to keep paying the lawyers' fees in the bankruptcy case.

6. As part of the liquidation of its assets in the bankruptcy case, the Diocese recently announced the sale of its offices in South Burlington for some $3.3 million. The prospect of the infusion of cash into the bankruptcy estate of the Diocese triggered efforts by the Claimants' lawyers to pursue litigation against the parishes in bankruptcy court some two years after the bankruptcy case was filed. It is expected that the proceeds from the sale of the Diocesan offices will be used to fund litigation by way of an adversary proceeding against the parishes in the bankruptcy court for which the Claimants are seeking permission to file. As a result of the

litigation against the parishes the funds available to pay the victims will be substantially depleted. Unlike the Claimants whose fees and expenses in the bankruptcy court are paid by the Diocese as the debtor, the parishes will have to fund their own defense and will incur substantial sums for attorneys' fees and expenses resulting in undue economic hardship.

7. The litigation in state and bankruptcy courts against the parishes is unconstitutional and must be halted. The civil courts cannot be the tools of the economic ruin of the parishes as communities of the faithful and the loss of the properties that equitably belong to the parishioners and are used for the purpose of exercising their religion. Any judgement against the parishes for the tortious conduct of parish clergy means that under Vermont law the parishioners are personally liable solely because they are Catholics. The litigation against the Parishes in state court has been stayed, and likewise the bankruptcy case should be stayed pending the determination of the constitutionality of the legal proceedings against the parishes.

**THE PARTIES**

8. The plaintiffs are unincorporated associations, and all were in existence by or before 1950. Under Vermont law unincorporated associations have the capacity to sue and/or be sued. 12 V.S.A. §814.

9. Defendants P.A., C.B., and M.F. are residents of Vermont, defendant D.S. is a resident of Alaska, defendant M.R. is a resident of Virginia, and defendant C.C. is a resident of Florida. These defendants are referenced by their initials for the purpose of this suit even though they have made their names public by filing civil suits against the Parishes.

10. Defendants John and Jane Doe I-X are fictitiously named defendants whose identities will have to be determined in discovery and this complaint will be amended at such time. These individual Doe defendants are claimants in the bankruptcy case filed by the Diocese and

their identities are not publicly known. Defendant John Doe I is a plaintiff in an action brought as John Doe against some of the plaintiffs in this case, Docket No. 26-CV-00066, and alleges to be a resident of Oklahoma. Plaintiffs reserve the right to amend and name the Doe defendants as their identities become known.

## JURISDICTION

11. This Court has jurisdiction to address a federal question under 28 U.S.C. §1331. Venue is proper in this Court under 28 U.S.C. §1391(b)(2).

## FACTS

12. Defendants have filed suit in state court against the Parishes:

a. *P.A. v. Saint Monica Parish in Barre, Mater Dei Parish in Newport, et al.*, Washington Unit, Docket No. 26-CV-00421,

b. *D.S. v. Christ the King Parish in Rutland, St. Augustine Parish in Montpelier, et al.*, Washington Unit, No. 25-CV-05691,

c. *M.F. v. Christ the King Parish in Rutland, et al.*, Washington Unit, Docket No. 25-CV-05690,

d. *M.R. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No. 25-CV-05669,

e. *C.C. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No.25-CV-05708,

f. *C.B. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No. 25-CV-05703, and

g. *Doe v. St. John the Baptist, et al.*, Chittenden Unit, Docket No. 26-CV-00066.

(Collectively referred to as “State Court Suits” brought by “State Court Plaintiffs”).

13. The state courts in ruling on the Parishes’ motions to dismiss stayed the State Court Suits *sua sponte* starting on May 29, 2026, in the cases pending in Washington County, and on July 14, 2026, in the cases pending in Chittenden County. A copy of the master decision issued in the M.F. case that was adopted in the other State Court Suits, is attached hereto as Exhibit A.

### A. **Parishes Are Communities of the Faithful with Pastoral Care Provided by the Diocesan Appointed Priests**

14. In the course of filings on the Parishes' motions to dismiss in the State Court Suits, the State Court Plaintiffs filed the 2013 Parish Finance & Administrative Manual (the "Manual") attached hereto as Exhibit B. As an exhibit relied on by the State Court Plaintiffs in the State Court Suits to factually support their complaints, the State Court Plaintiffs (now defendants here) have judicially admitted the truth and veracity of the Manual.

15. Section II of the Manual reflects the Code of Canon Law description of the parishes as a community of the faithful under the pastoral care of a parish priest appointed by the Bishop:

> As defined by the canons of the *Code of Canon Law*, the law of the Roman Catholic Church, a parish is "a certain community of Christ's faithful stably established within a particular church [diocese], whose pastoral care, under the authority of the diocesan Bishop, is entrusted to a parish priest as its proper pastor" (canon 515).

*Id*. Chapter II, p.1.

16. The Manual describes the parishioners as members of the parishes:

> A parish is the community where the faith life of *each member* is nourished. It is a family where, under the leadership of the pastor, *each member* contributes to the success of the whole, of the building up of the Kingdom of God in the local community, as part of the Universal Church.

*Id*., emphasis added.

17. The Manual explains that every baptized Catholic is a member of a parish:

> *Every Catholic is a member of a parish.* Every parishioner is encouraged to register in his/her parish and play a full and active role in parish life. In addition to the regular reception of the Sacraments, culminating in the faithful attendance at Holy Mass on Sundays and holy days of obligation, as well as ongoing catechesis, parishioners may volunteer under the guidance of the pastor/administrator to help as catechists in religious education programs, organize youth ministry and adult events, assist in charitable activities in the community and so forth. They may be invited by the pastor/administrator to serve as, among other roles, extraordinary ministers of Holy Communion, lectors, altar servers and ushers.

*Id*. p.2, emphasis added.

18. The Manual addresses the role of the parishioners as members of the parishes:

> **Parishioners** are the lay members of the parish. They partake of the Sacraments and are encouraged to play an active role in the parish mission, volunteering in many capacities. They are relied upon to financially support the parish as their means permit.

*Id*., emphasis in bold in original; italicized added.

**B. Unincorporated Associations Have No Governance Structure Under the Law**

19. Vermont law regulates the governance of business corporations and non-profit corporations. Title 11A, Chapter 8 addresses Business Corporations' directors and officers, their election, terms in office, removal, meetings, duties, powers, and standards of conduct. Other Chapters deal with many aspects of how business corporations function. Similarly nonprofit corporations under Title 11B are regulated by the State. There are however no such laws that address the governance of unincorporated associations.

**C. Parishes Do Not Have the Authority to Retain, Assign, Supervise, Transfer, Discipline or Remove a Priest**

20. An essential feature of governance in the Catholic Church is the hierarchal structure of Dioceses at each jurisdiction of their formation. The U.S. Supreme Court has recognized the hierarchal structure of the Church:

> The Catholic Church is a single worldwide religious institution. The Church is headed by the Pope. Code of Canon Law, Canon 331 (Latin-English ed. 1998). Catholics believe that the Pope is the successor of St. Peter, the Apostle chosen by Jesus to lead the Church. *Ibid.; supra*, at 1596 - 1597. The Church is divided into dioceses. A diocese generally consists of "all the faithful living" within "a definite territory," who together constitute "a particular church" within the universal church. Code of Canon Law, Canons 369, 372, § 1. Each diocese is "entrusted to a bishop for him to shepherd." Canon 369. The bishop exercises "legislative, executive, and judicial power" over his diocese. Canon 391, § 1.
>
> This structure of the Church is a matter of faith, not mere administrative convenience. Catholics believe that in naming the Apostles, Jesus personally established the office of bishop and willed that "the bishops ... should be shepherds in his church right to the end of the world." Second Vatican Council, Lumen

> Gentium § 18 (1964) (citing John 20:21), in 2 Tanner 849, 863; see Code of Canon Law, Canon 375, § 1 ("Bishops ... by divine institution succeed to the place of the Apostles through the Holy Spirit who has been given to them").
>
> The Church understands itself to have a "three-fold" religious mission: "proclaiming the word of God," "celebrating the sacraments," and "exercising the ministry of charity." Pope Benedict XVI, Deus Caritas Est ¶25(a) (2005). "These duties presuppose each other and are inseparable." *Ibid*. "The Church" therefore "cannot neglect the service of charity"—that is, care "for widows and orphans, prisoners, and the sick and needy of every kind"—"any more than she can neglect the Sacraments and the Word." *Id.*, ¶22.
>
> In keeping with the Church's hierarchical structure, "the Bishops" have "primary responsibility for carrying out ... the service of charity" at the local level. Pope Benedict XVI, On the Service of Charity, Introduction (2012) (internal quotation marks omitted). In particular, bishops are bound under canon law to establish within their territories organizations to carry out charitable works in the name of the Church subject to their supervision and control. Brief for Catholic Charities USA as *Amicus Curiae* 18; see generally On the Service of Charity. "In the United States, these organizations are known as Catholic Charities." Brief for Catholic Charities USA as *Amicus Curiae* 15. The works of these organizations are considered acts of the Church itself. Deus Caritas Est ¶29.

*Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 264–65, 145 S. Ct. 1583, 1600, 221 L. Ed. 2d 881 (2025).

21. The Vermont Supreme Court also acknowledged this fact: "We understand that the diocese is hierarchical, with the bishop appointed by Roman Catholic Church hierarchy and not the members of the diocese or a parish. Similarly, the evidence here shows that the diocese employed Father Willis [the offending priest]." *Turner v. Roman Cath. Diocese of Burlington, Vermont*, 2009 VT 101, ¶ 62, 186 Vt. 396, 430, 987 A.2d 960, 985 (2009).

22. The artificial intelligence ("AI") that powers Google's search engine and represents a source of collective knowledge online describes the governance of the Church as hierarchical organized as dioceses led by bishops and parishes led pastorally by priests:

> The Catholic Church is a strictly hierarchical, worldwide organization with the Pope at the top, serving as the Bishop of Rome and head of the Church. It is

> organized geographically into dioceses led by bishops, and locally into parishes led by priests, with the primary mission of pastoral care and evangelization.

23. The Manual encourages parishioners to volunteer their services to the parishes.

> "Parishioners are encouraged to offer their talents and expertise to further the mission of the parish by serving on the parish Pastoral Council and parish Finance Council." Ex B, Chapter II, p.2. Parishioners can participate in the Parish Finance Committee which "[i]s a consultative body of lay persons mandated by the *Code of Canon Law* to advise the pastor in matters pertaining to the financial affairs of the parish . . . ." Chapter III, p.1. However, it is made clear that the advisory role is only that, and the pastor has the authority. "The Parish Finance Council is advisory to the pastor and its decisions/recommendations are valid only when accepted and ratified by the pastor."

*Id*., emphasis in original.

24. Similarly, parishioners can participate in the Parish Pastoral Council by way of consultation but under the direction of the pastor:

> **Parish Pastoral Council** (commonly referred to as the Parish Council), required by Diocesan policy, is a consultative board, representative of clergy, religious and laity, which works together under the guidance and direction of the pastor to promote the spiritual welfare of all persons within the parish as outlined in Exhibit B of the parish Declaration of Trust (cf. canon 536 §1).

*Id*. Chapter II, p.1, emphasis in original.

25. The Manual confirms the hierarchal structure under the direction of the Bishop for the pastoral care of the parishes. A parish pastor is appointed by the Bishop:

> According to the *Code of Canon Law*, the pastor "exercises the pastoral care of the community [parish] entrusted to him *under the authority of the Diocesan Bishop*, whose ministry of Christ he is called to share, so that for this community he may carry out the offices of teaching, sanctifying and ruling with the cooperation of other priests or deacons and with the assistance of lay members of Christ's faithful, in accordance with the law" (canon 519).

*Id.*, p.2, emphasis added.

26. The parish pastor's leadership role is described as including the administration and oversight of the clergy:

> The pastor is the spiritual leader of the parish community. *He is also the person directly responsible for the daily administration of the parish, including oversight of clergy, employees and volunteers and stewardship of all financial matters – all matters pastoral and financial of his parish.*

*Id*., emphasis added.

27. The parish pastors in turn report to the Bishop whose responsibilities include the governance of the diocese:

> According to the *Code of Canon Law*, "by divine institution, Bishops succeed the Apostles through the Holy Spirit who is given to them. They are constituted Pastors in the Church, to be the teachers of doctrine, the priests of sacred worship, and the ministers of governance" (canon 375).

*Id.* p.6.

28. The Bishop is responsible for overseeing the proper administration and conduct of the parishes with pastors reporting regularly to him:

> The Bishop of Burlington is responsible for overseeing the proper administration and conduct of each Roman Catholic community of faith in Vermont. He does so by appointing a competent priest as pastor or administrator, and receiving regular reports and updates on the parish. The Bishop, moreover, visits each parish as often as is practicable, to celebrate Mass, administer the Sacrament of Confirmation, or attend parish activities and events.

*Id*.

29. The Manual confirms that the parish pastors and any additional parish clergy are appointed by the Bishop and overseen by him. A Pastor can oversee the conduct of parish clergy and report to the Bishop. None of this authority rests with the parish or parishioners.

30. The essential nature of the relationships of the Diocese, the Bishop, parish pastors, the clergy and the parishioners as described in the Manual was the same in the 1970's at the time of the abuse alleged in the State Court Suits.

**D. <u>Vermont Law Imposes Strict Personal Liability on the Members of an Unincorporated Association at the Time of the Alleged Tortious Conduct by the Association</u>**

31. The longstanding law in Vermont for over 100 years is that the members of an unincorporated association are personally responsible for the liabilities of the association for the torts of any parishioners in the course of the association's business. 12 V.S.A. §5060 states:

> When execution on a judgment obtained against a partnership, association or company in its firm, associate or company name is returned unsatisfied in whole or in part, an action of contract for the amount unpaid may be brought against any or all of the partners, associates or shareholders upon their original liability, provided that only one such action shall be brought and maintained at the same time. If the execution issued in the last named action is returned unsatisfied in whole or in part, subsequent actions may in like manner be maintained for the amount unpaid.

32. In *Daniels v. Elks Club of Hartford,* 2012 VT 55, 192 Vt. 114, 58 A. 3d 925 (2012), the Vermont Supreme Court held that under section 5060, the innocent members of an unincorporated association are responsible for liabilities of the association created by other members. The Court's discussion of the personal liability of the members of Elks Club started with the nature of an unincorporated association and Black's Law Dictionary definition of a voluntary association as "'[n]ot a legal entity separate from the persons who compose it.'" *Id*. ¶42.

33. The Court noted that "[w]here a judgment against an association is unsatisfied, the creditor may pursue an action against any or all of the associates for the unfulfilled amount." Id. The Court found support in its decisions from another century that treated unincorporated associations like a "large partnership." *Id*. ¶44. In other words, the members are strictly liable regardless of personal culpability for the wrongdoing by other members in the course of association related conduct that yielded the liability:

> The judgment against the association is conclusive 'in respect to all matters involved in the suit upon all persons who were members' when the liability arose. (citation). That is, insofar as a judgment has entered, the issue of liability is not to be relitigated; *the question is simply of collection*.

*Id*. ¶45, emphasis added.

34. The Court added that once a judgment is entered against an unincorporated association, "[t]he members are then jointly and severally liable and may be sued individually or together." *Id*. The Court reaffirmed the holding of a 1906 decision that "[t]he separate property of each member" can be attached and thereby create, practically speaking, limitless deep pocket for associations consisting of "an indefinite number" of members. *Id*.

35. The Court rejected the concern of the dissent that the rather harsh result should not apply to non-profit groups because "'[m]ere membership' without some sort of 'active participation' in the wrongful act should not result in liability." *Id*. ¶47. The Court acknowledged that the common law may have evolved in other jurisdictions as urged by the dissent but the Court was obligated to apply section 5060 as written. If the outcome was unfair or unjust, it was "[u]p to the Legislature to modify the statute to produce a different result." *Id*. ¶48. The Court added that the reference in section 5060 to "any or all" of the associates in an unincorporated association "[i]s wholly inconsistent with an interpretation that would allow the trial court to impose liability on some of the members but not others." *Id*. ¶49. The Court left no doubt of the strict personal liability of each and every member of an association for the wrongdoings of other members in the course of the association's business.

**E. <u>Defendants and Other Claimants Seek to Hold Every Catholic Vermonter Personally Liable for an Astronomical Sum of Money</u>**

36. The defendants are claimants in a bankruptcy case filed by the Diocese, *In Re Roman Catholic Diocese of Burlington,* Vermont, Case No. 24-10205. There are currently over 115 such claimants in the bankruptcy case (collectively the "Claimants"). The Claimants' lawyers have publicly stated the parishes have $500 million in assets when they knew or should have

known from the financial records produced in the bankruptcy case that in 2025 less than 10% of this figure represented the total funds available to the 78 then existing parishes. These funds generate returns to support the restricted and unrestricted parish financial obligations including the annual cost of maintaining churches and other parish buildings — heating, utilities, maintenance, grounds and repairs, as well as support for rectories, schools, community charities, cemeteries and related activities.

37. According to Google AI, a reasonable average annual investment return benchmark is 7%. The annual returns for each parish vary and likely lower than 7%, but for the purpose of this discussion, the average per parish annual return based on the 7% benchmark in 2025 would be approximately $42,700. For all 78 parishes, the total annual income under these assumptions would be less than 1% of the figure disseminated by the Claimants' lawyers. Google AI also informs that the cost of maintaining a household in Vermont is $48,000 to $72,000 per year. In other words, the average annual income per parish is less than the cost of maintaining a household. Many parishes also rely on the generosity of the parishioners with their periodic gifts or donations to support the operating budgets. However, parishioners in Vermont like other Vermonters are experiencing financial distress with skyrocketing property taxes amidst increasing inflation/cost of living, fuel, etc. Although these figures are averages to demonstrate the highly exaggerated figures floated publicly, many parishes must financially survive with budgets well under the poverty line and are therefore struggling to keep functioning.

38. As for fixed assets such as buildings used for places of worship, community events, schools, and rectories, the figures used by the Claimants do not accurately reflect market values. For example, the cost of replacement of a building for insurance purposes may be an impressive figure but the market value is an entirely different matter. An aging church building in rural

Vermont with poor insulation and outdated heating, plumbing and electrical infrastructure may have a replacement value in high six figures in the event of an insurable loss such as fire or flooding but has little or no market value for sale as-is in the marketplace. More likely a potential buyer would consider the mere assumption of ownership and the associated liabilities as sufficient consideration. The market value of churches and buildings in urban areas such as Chittenden County are higher but potential buyers are deterred by the threat of litigation by the Claimants under theories that can challenge the transfers of ownership. The Vermont Legislature in 2019 effectively eliminated the defense of the statute of limitations for churches as organizations in clergy abuse suits, and the concern over endless litigation involving parish properties will reduce the market value of these properties as well as the pool of potential buyers. The promotion of the $500 million figure by the Claimants' lawyers has created an expectation by the Claimants of recovery well in excess of Diocesan and parish assets.

39. The State Court Plaintiffs in their Opposition to the Parishes' motion to dismiss in the State Court Suits referenced 12 V.S.A. §5060 and *Daniels v. Elks Club of Hartford*, 2012 VT 55, 192 Vt. 114, 58 A. 3d 925 (2012). In order not to alarm the trial court, however, the State Court Plaintiffs asserted "[p]arishioners are not 'members' as the term is used in the context of an unincorporated association's liability under Vermont law. A parish's 'members' in this context are those who are entrusted to manage the administrative and fiduciary affairs of the parish."

40. The state trial court rejected the State Court Plaintiffs' contention, noting that the law emphasized layperson parishioner liability. The Court added that the First Amendment issue must be resolved before any merits determination:

> In their briefing, the parties spar about the potential implications of the Parishes' alleged status as "unincorporated associations." Defendants argue, if liability is established against the parishes, then under 12 V.S.A. §5060, as interpreted by the Supreme Court in *Daniels v. Elks Club of Hartford*, 2012 VT 55, 192 Vt. 114, the

> layperson parishioners of each Parish would have ultimate and individual responsibility to satisfy any liability of the association's assets prove insufficient. Mr. Ferland contends to the contrary that individual parishioner liability would be limited to only those engaged in the tortious conduct or were officers and directors of each Parish (although it is unclear during what periods such liability would apply). Mr. Ferland's counterargument is similar to the opposing view, urged by the dissent in *Daniels*, which was squarely rejected by the majority. See *Daniels*, 2012 VT 55, at J] 46-49.
>
> To the extent (and without now deciding) that the Parishes might be properly characterized as the sort of unincorporated associations contemplated in 12 V.S.A. § 5060 and Daniels, those authorities would appear to counsel in favor of layperson parishioner liability. A pure application of *Daniels* in this case, however, raises two immediate questions. First, it creates question of whether current members should be held individually liable for the actions of members from 50 years ago or whether some equitable limiting principle should apply. Second, liability in this situation would arise solely from religious affiliation. This in turn raises First Amendment issues involving Free Association and Free Exercise issues. *See, e.g., Juhl v. Airington*, 936 S.W.2d 640, 642 (Tex. 1996) (curtailing unincorporated association liability that infringed on the right of free association) (citing *NAACP v. Clairborne Hardware*, 458 U.S. 886, 931-32 (1982)). While Defendants have raised some of these issues in their preliminary filings, the issues have not been fully briefed. To the extent that they are relevant to the ultimate resolution of the matter, the Court finds it is premature at the pleading stage to resolve these issues on the present record. Given further that Defendants' motion to dismiss does not hinge on this issue, the Court declines to address these issues at this time. *Nevertheless, they pose complicated and serious concerns that will have to be addressed before this litigation can proceed to any type of merits determination.*

Ex A, emphasis added.

41. The claim of negligence against the Parishes is the product of a "copy & paste" exercise from the complaints filed against the Diocese with a key change — the status of parish pastors and priests assigned to the parishes by the Bishop were changed from employees of the Diocese to the employees of the Parishes. The inaccurate allegation that the Diocesan appointed pastors and priests were employed by the parishes was to allow the State Court Suits to proceed past a motion to dismiss.

42. The Claimants including the defendants have filed a motion in the bankruptcy court to start litigation against the parishes. The relief the Claimants seek includes the liquidation of all parish properties.

43. Under bankruptcy rules, the fees of the Claimants' lawyers in the bankruptcy case are paid by the Diocese as the debtor. The Diocese has incurred to date over $2 million in attorneys' fees and expenses. Not a single penny of this money has found its way to the victim-claimants. The Diocese recently announced the sale of its offices in South Burlington for $3.3 million. That sale and the promise of more cash to pay attorneys' fees coincided with the uptake in litigation activities in the bankruptcy court against the Parishes. It appears that much if not all of the Diocese's limited assets will be used to pay the Claimants' lawyers to litigate in the bankruptcy court, and not a penny will go to the victims/claimants.

44. Armed with a litigation budget of $3.3 million of Diocesan money, the Creditors' Committee is now poised to pursue the Parishes and all parishes in litigation in bankruptcy court to deprive them of their property. The Creditors' Committee is taking steps to not only destroy the ability of the parishes to function as communities of the faithful but to impose a significant religious tax on individual Catholic Vermonters solely because they were baptized Catholic. Sadly, child abuse is a well-known problem in all walks of society but unlike abuse by those in positions of authority over children such as teachers, day care workers, coaches, recreational staff, healthcare providers, and family members, with parishes as unincorporated associations, the abusive conduct of one parishioner means liability for every member of the Catholic community. If the negligence of the Diocese is somehow imputed to the parishes, as unincorporated associations the responsibility to pay any judgments under Vermont law will be imposed on every parishioner at the time of the negligent conduct.

45. Under Canon law as well as common law, the churches and related properties used by the parishes for religious purposes were administered by the Bishop for the benefit of the parishioners. Historically these properties were purchased, constructed, repaired, and maintained by the parishioners *from the funds raised by them*. (Emphasis added). In 2006, the Bishop formalized the existing common law Resulting trusts as express charitable trust instruments to reflect the historic reality under both common law and Canon law.

46. The use of the civil courts to deplete and take parish assets will deprive the faithful of resources such as buildings and spaces to be used for worship, education, community affairs and other charitable functions of organized religion. With the bankruptcy of the Diocese, the litigation against the parishes is a money-grab directed at the properties of the parishes and the personal assets of Catholic Vermonters. The parish litigation will shut down the parishes, chill future membership and unduly burden parishioners in the exercise of their faith.

**COUNT I**
**(VIOLATION OF FIRST AMENDMENT RIGHT TO FREE ASSOCIATION)**

47. The allegations in the preceding paragraphs are referred to and incorporated.

48. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257, 145 S. Ct. 1583, 1596, 221 L. Ed. 2d 881 (2025). The First Amendment guarantees the "right to organize voluntary religious associations," *Watson v. Jones*, 80 U.S. 679, 13 Wall. 679, 728, 20 L.Ed. 666 (1872).

49. The parishes as a community of the faithful have the constitutional right to freely associate in the exercise of religion and to use the buildings and lands to gather for religious

services, celebrate baptisms and marriages, and put to rest their dead at funerals and burials — all functions in pursuit of the Christian faith.

50. The imposition of civil liability on the parishes because of the illegal conduct of a parish priest for abusing minors or the negligence of a Diocesan official in overseeing the offending clergy, infringes on the right of free association of the parishes as communities of parishioners. The Supreme Court has held that the imposition of tort liability on civil rights organizations, NAACP and Mississippi Action for Progress (MAP), for their roles in promoting a politically motivated boycott of businesses in Mississippi, was unconstitutional despite evidence that some individual members had engaged in acts of violence which were not protected under the First Amendment:

> *Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.* "In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)." *Carroll v. Princess Anne*, 393 U.S. 175, 183–184, 89 S.Ct. 347, 353, 21 L.Ed.2d 325.

*N. A. A. C. P. v. Claiborne Hardware Co.,* 458 U.S. 886, 920, 102 S. Ct. 3409, 3429, 73 L. Ed. 2d 1215 (1982), emphasis added.

51. The Court explained that without evidence that the civil rights organizations had authorized the violence or ratified it, tort liability could not be imposed on the organizations because some members had acted illegally during the course of the boycott: "To impose liability without a finding that the NAACP authorized — either actually or apparently — or ratified unlawful conduct would impermissibly burden the rights of political association that are protected

by the First Amendment." *Id*. at 931. The Court quoted from Justice Douglas' opinion on the constitutional barrier to the imposition of guilt by association:

> Recognizing that guilt by association is a philosophy alien to the traditions of a free society (see *Schware v. Board of Bar Examiners*, 353 U.S. 232, 245–246, 77 S.Ct. 752, 759, 1 L.Ed.2d 796) and the First Amendment itself, we have held that *civil or criminal disabilities may not be imposed on one who joins an organization which has among its purposes the violent overthrow of the Government, unless the individual joins knowing of the organization's illegal purposes* (*Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216) and with the specific intention to further those purposes. See *Elfbrandt v. Russell*, [384 U.S., at] 11 [86 S.Ct., at 1238]; *Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992." Id., at 122, 86 S.Ct., at 1308.

*Id*. at 932, emphasis added.

52. The Court held that those who engaged in unlawful conduct can be held individually liable, but the group was constitutionally protected unless the heavy burden of showing group action can be met:

> The taint of violence colored the conduct of some of the petitioners. They, of course, may be held liable for the consequences of their violent deeds. The burden of demonstrating that it colored the entire collective effort, however, is not satisfied by evidence that violence occurred or even that violence contributed to the success of the boycott. A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts. Such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity. The burden of demonstrating that fear rather than protected conduct was the dominant force in the movement is heavy. *A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees.*

*Id*. at 933-34, emphasis added.

53. The Court's observation that the true color of a forest is represented by the foliage of countless trees and not the few reptiles hidden in the weeds, is particularly apt here with the

actions of some perpetrator clergy in the Catholic church which is the largest branch of Christianity and in turn the most popular religion in the world.

54. As communities and associations of the faithful engaged in the pursuit of the First Amendment freedom of religion, the imposition of civil liability on the parishes for the criminal conduct of perpetrator clergy amounts to a constitutional infringement. Not even the alleged negligence of any parish pastor or Diocesan official responsible for the oversight or control of the perpetrator clergy can overcome the First Amendment protection that requires an organizational authorization or ratification of child abuse. The conduct of any individual clergy engaged in the sexual abuse of minors is, as a matter of law, outside the scope of their duties, and so is the conduct of any official who the Claimants may allege authorized or ratified the acts of child abuse. *Doe v. Newbury Bible Church*, 2007 VT 72, ¶6, 182 Vt. 174, 176–77, 933 A.2d 196, 198 (2007). The parishes are therefore protected as a matter of law from civil liability arising from clergy abuse.

55. The Texas Supreme Court applied the *NAACP* decision to bar the personal injury tort claim of a police officer who was injured by abortion protestors. *Juhl v. Airington*, 936 S.W.2d 640, 642 (Tex. 1996). Texas law, unlike Vermont, did not render the members of an unincorporated association automatically liable for the torts of other members in the course of the association's business. Nonetheless, the Texas Supreme Court cited the *NAACP* decision as an additional reason for the rejection of the civil suit. The Court noted the U.S. Supreme Court had "[r]efused to allow the national organization to be liable for the actions of some members of a local chapter unless it had authorized or ratified the unlawful conduct, . . . ." *Id*. 642. Moreover, the Texas Court observed that the U.S. Supreme Court did not "[a]llow individual members to be held liable for mere membership in the local chapter absent proof of 'a specific intent to further an unlawful aim embraced by the group.'" *Id*.

56. The Parishes seek declaratory judgment that the litigation pursued against them in state courts as well as the bankruptcy court to impose tort liability for the acts of perpetrators violates the First Amendment. Similarly, the use of the bankruptcy court to deprive the parishes of the properties equitably owned by them and used to exercise their faith is a violation of the First Amendment. The State Court Suits were stayed by the state courts, and this Court should stay the bankruptcy court proceedings until such time the constitutional challenges have been adjudicated.

**COUNT II**
**(VIOLATION OF FIRST AMENDMENT RIGHT TO FREE EXERCISE)**

57. The allegations in the preceding paragraphs are referred to and incorporated.

58. The First Amendment prohibits Congress from making any "law respecting an establishment of religion or prohibiting the free exercise thereof. " Const. Amend. I. The Fourteenth Amendment makes that prohibition equally applicable to the states. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993); *Employment Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990). The prohibition extends to common law provisions as well as statutory enactments.

59. "At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts.'" *Mahmoud v. Taylor*, 606 U.S. 522, 546, 145 S. Ct. 2332, 2351, 222 L. Ed. 2d 695 (2025).

60. When the State places a substantial burden on the free exercise of religion it must provide a compelling interest to justify it. See *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989)("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or

practice and, if so, whether a compelling governmental interest justifies the burden"); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987)(state laws burdening religions "must be subjected to strict scrutiny and could be justified only by proof by the State of a compelling interest"); *United States v. Lee*, 455 U.S. 252, 257–258, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) ("The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest"); *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest"); *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion"); *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963) (question is "whether some compelling state interest ... justifies the substantial infringement of appellant's First Amendment right").

61. The most extreme form of infringement on the right to freely exercise religion is for the Government to outright ban a religion. The use of the civil courts, state and federal, to deprive the parishes of the properties and resources they rely on to exercise Catholicism is the functional equivalent of the Government banning religion. The use of the civil courts, state and federal, to hold parishioners individually liable for the illegal acts of parish priests or the negligence of diocesan officials in overseeing clergy will effectively chill the practice of religion by the faithful and deter them from freely practice their chosen religion. Whether the Government puts padlocks on church doors or enables the Claimants to liquidate parish property and pursue

individual liability, the outcome is equally offensive to the First Amendment. There can be no justification for the Government to eliminate a religion.

62. The Parishes seek declaratory judgment that the litigation pursued against them in state courts as well as the bankruptcy court to impose tort liability for the acts of a perpetrator and/or to take their property in the course of the Diocese bankruptcy violates the First Amendment. The State Court Suits were stayed by state court order, and this Court should stay the bankruptcy court proceedings until such time the constitutional challenges have been adjudicated.

**COUNT III**
**(VIOLATION OF FIRST AMENDMENT RIGHT TO CHURCH AUTONOMY)**

63. The allegations in the preceding paragraphs are referred to and incorporated.

64. "The church autonomy doctrine forbids courts from adjudicating matters of church governance, including church discipline and the church's understanding of its own membership." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 639 (5th Cir. 2025), cert. denied, 146 S. Ct. 1674, 224 L. Ed. 2d 16 (2026) citing *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139–40, 21 L.Ed. 69 (1872) ("It may be conceded that we have no power to revise or question ordinary acts of church discipline. [W]e cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off."). *See also Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 591 U.S. 732, 746, 140 S. Ct. 2049, 2060, 207 L. Ed. 2d 870 (2020).

65. The clergy abuse civil litigation against the Parishes in state courts and bankruptcy court interferes with a fundamental tenet of Catholicism that every Catholic is a member of the parish where he or she resides. The imposition of personal liability on innocent parishioners is tantamount to the Government restricting parish membership and thereby unconstitutionally interfering with church autonomy.

66. The clergy abuse civil litigation against the Parishes in state courts and bankruptcy court violates the church anatomy doctrine by compelling the parishes to organize in a manner other than an unincorporated association which is most consistent with the Church tenet that every Catholic is a member of a parish. Any other manner of organization such as a nonprofit corporation is inconsistent with Church autonomy as members must be admitted. 11B V.S.A. §6.01.

67. The Parishes seek declaratory judgment that the litigation pursued against them in state courts as well as the bankruptcy court that would impose tort liability for the acts of a perpetrator and/or take parish properties in the course of the Diocese bankruptcy violates the First Amendment. The State Court Suits were stayed by state court order, and this Court should stay the bankruptcy court proceedings until such time the constitutional challenges have been adjudicated.

WHEREFORE the plaintiffs request the following relief:

1. Declaratory judgment that all pending civil proceedings, state and bankruptcy courts, against the parishes are unconstitutional;

2. Emergency stay of the bankruptcy case filed by Diocese until the constitutional issues raised in this Complaint are finally determined; and

3. Such other relief as may be appropriate.

Dated this 21st day of July, 2026.

Respectfully submitted,

*/s/ Kaveh S. Shahi*
Kaveh S. Shahi, Esq.
Gfeller Laurie LLP
110 Merchants Row, Suite 3
Rutland, VT 05701
(802) 775-8800
kshahi@gllawgroup.com
*Attorneys for Plaintiffs*